UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

SHANNON Z. KOLNSBERG, RICHARD J.
VON CULIN, and GLINDA DENISE COLTER,
individually and as representatives of a Class of
Participants and Beneficiaries of The Boehringer
Ingelheim USA Corporation and Its Affiliates
Retirement Savings Plan,

      Plaintiffs,                                            Case No:

      v.

BOEHRINGER INGELHEIM USA
CORPORATION, BOARD OF DIRECTORS
OF BOEHRINGER INGELHEIM USA
CORPORATION, and the PLAN SPONSOR
COMMITTEE OF BOEHRINGER INGELHEIM
USA CORPORATION,

      Defendants.

---

**CLASS ACTION COMPLAINT**

---

Plaintiffs Shannon Z. Kolnsberg, Richard J. Von Culin, and Glinda Denise Colter ("Plaintiffs"),

individually and as representatives of a Class of Participants and Beneficiaries of The Boehringer

Ingelheim USA Corporation and Its Affiliates Retirement Savings Plan (the "BI Plan" or "Plan"), by

their counsel, WALCHESKE & LUZI, LLC, and COWDERY, MURPHY & HEALY, LLC , as and

for a claim against Defendants, alleges and asserts to the best of their knowledge, information, and

belief, formed after an inquiry reasonable under the circumstances, the following:

**INTRODUCTION**

1.      The Employee Retirement Income Security Act ("ERISA") requires a fiduciary to

act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence"

of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in its own interest.  29 U.S.C. §§ 1104(a)(1), 1106(a)(1)(D), 1106(b)(1).

2.    Plaintiffs brings this ERISA action under 29 U.S.C. § 1132(a)(2) and Rule 23 of the Federal Rules of Civil Procedure, individually and as representatives of a class of participants and beneficiaries of the BI Plan, against Defendants Boehringer Ingelheim USA Corporation ("BI"), Board of Directors of Boehringer Ingelheim USA Corporation ("Board"), and the Plan Sponsor Committee of Boehringer Ingelheim USA Corporation ("Plan Committee") (collectively "Defendants"), for breaching their fiduciary duties and engaging in prohibited transactions with regard to the BI Plan.

3.    This Complaint alleges class ERISA fiduciary breach claims based on  breaches of loyalty, prudence, monitoring, and for party-in-interest and fiduciary prohibited transactions, based on Defendants' misallocating Plan forfeitures for their own benefit under the BI Plan.

**JURISDICTION AND VENUE**

4.    This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

5.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

6.    Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

**PARTIES**

7.      Plaintiff Shannon Z. Kolnsberg is a resident of the State of Illinois, and during the Class Period was a participant in the BI Plan under ERISA § 3(7), 29 U.S.C. § 1002(7), and paid Plan administrative expenses during that same period.

8.      Plaintiff Richard J. Von Culin is a resident of the State of Alabama, and during the Class Period was a participant in the BI Plan under ERISA § 3(7), 29 U.S.C. § 1002(7), and paid Plan administrative expenses during that same period.

9.      Plaintiffs Glinda Denise Colter is a resident of the State of Missouri, and during the Class Period was a participant in the BI Plan under ERISA § 3(7), 29 U.S.C. § 1002(7), and paid Plan administrative expenses during that same period

10.     Plaintiffs have Article III standing to bring this action on behalf of both the BI Plan because they suffered actual injuries-in-fact through the misallocation of Plan forfeitures by Defendants with regard to the BI Plans during the Class Period by not having Plan forfeitures utilized to pay some or all of their Plan administrative expenses. Those injuries are fairly traceable to Defendants' unlawful conduct in using Plan forfeitures for their own benefit to reduce their contributions to the Plan, and those harms are likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and to the Class.

11.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), on behalf of the BI Plan and for relief that sweeps beyond their own injuries.

12.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan forfeitures) necessary to understand that Defendants breached their fiduciary duties and engaged in prohibited transactions until shortly before this suit was filed.

3

13.     Having never managed a very large 401(k) plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of how Plan forfeitures should be allocated.

14.     Boehringer Ingelheim USA Corporation ("BI") is a privately-owned, global pharmaceutical company that develops treatments for both human and animal health. The company has a significant global presence, employing over 53,000 people and operating in more than 130 markets worldwide. In the United States, BI maintains its principal place of business in Ridgefield, Connecticut, at 900 Ridgebury Road, Ridgefield, CT 06877. In this Complaint, "BI" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

15.     BI acted through its officers, including its Board of Directors and Plan Committee, to perform Plan-related fiduciary functions in the course and scope of their business. Under Section 10.1 of The Boehringer Ingelheim USA Corporation and Its Affiliates Retirement Savings Plan, amended and restated effective January 1, 2017 ("Plan Document"), BI and its Board appointed other Plan fiduciaries to the Plan Committee, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, BI and its Board are fiduciaries of the BI Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

16.     Under Sections 10.1, 10.2, and 10.8 of the Plan Document, the BI Plan Sponsor Committee ("Plan Committee") is the named fiduciary and Plan Administrator with day-to-day administration and operation of the BI Plan under 29 U.S.C. § 1002(21)(A). The Plan Committee has authority and responsibility for the control, management, and administration of the BI Plan in accordance with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

17.    With 12,376 participants and $2,767,848,540 in assets under management as of December 31, 2023, the BI Plan is one of the larger retirement plans in the country. It ranks in the top 0.13% of over 730,629 retirement plans in terms of the number of participants and the top 0.06% of plans in terms of the value of its assets.

## ERISA FIDICIARY AND PROHIBITED TRANSACTION STANDARDS

18.    ERISA exists, in large part, to protect the interests of participants, and their beneficiaries, in employee retirement plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citing 29 U.S.C. § 1001(b)).

19.    "[A]ny person who exercises discretionary authority or control in the management or administration of an ERISA plan" is, under the statute's terms, a fiduciary. *See Barchock v. CVS Health Corp.,* 886 F.3d 43, 44 (1st Cir. 2018) (citing 29 U.S.C. § 1002(21)(A)).

20.    ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the BI Plan, that are covered by ERISA.

21.    ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of like character and with like aims." ERISA § 404(a)(1)(A), (B), 29 U.S.C. § 1104(a)(1)(A), (B).

22.    These fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

5

23.     The obligation to ensure that retirement plan fees are reasonable is at the heart of ERISA fiduciary duties. *Marshall v. Snyder*, 572 F.2d 894, 897 (2d Cir. 1978) ("The responsibility for paying reasonable compensation was the unequivocal fiduciary responsibility of the [plan's fiduciaries].").

24.     The continuing duty to monitor is a subset of the duty of prudence, *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015), and requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*") (quoting RE-STATEMENT (THIRD) OF TRUSTS § 90(c)(3)).

25.     Defendant Plan Committee failed to fulfill their duty to loyally and prudently control the manner in which forfeitures were utilized by the Plan, and Defendants BI and it Board failed to properly monitor the Plan Committee with regard to the misallocation of Plan forfeitures.

26.     BI is also a party-in-interest because it is an employer "any of whose employees are covered by such plan." *Id.*, § 1002(14)(C).

27.     Because Defendants are all fiduciaries of the Plan and "deal[t] with the assets of the plan in [their] own interest or for [their] own account," they violated the fiduciary duty of loyalty and engaged in prohibited transactions under both 29 U.S.C. § 1106(a)(1)(D) and 29 U.S.C. § 1106(b)(1), by benefiting themselves as far as reducing their own future contributions to the BI Plan, making it unnecessary to take money out of their corporate revenues to support the Plan.

28.     Despite the conflict of interest presented by the decision to use BI Plan's forfeitures for BI's own benefit, Defendants also breached their duty of prudence by failing to undertake any prudent investigation into how to most prudently utilize those Plan forfeitures, including whether

they should have used more of those forfeitures to reduce or eliminate Plan administrative expenses for Plaintiff and other Plan participants during the Class Period.

## **MISALLOCATION OF PLAN FORFEITURES**

29.     The fiduciary duties of prudence, loyalty, as well as the duties to refrain from benefitting the company and self-dealing, under ERISA, are violated where, as here, the employer (1) is both the plan sponsor and plan administrator, (2) is faced with a conflict of interest in choosing between allocating plan assets toward offsetting its own contributions to the plan or defraying plan expenses that would otherwise be borne by plan participants, (3) fails to conduct any investigation as to which choice would be in the best interest of the participants, and (4) decides to allocate a portion of those plan assets toward reducing its own plan contributions because that choice best serves its own interests.

30.     Plaintiffs are both "participants" in defined-contribution plans under ERISA Section 3(7), 29 U.S.C. § 1002(7): The Boehringer  Ingelheim USA Corporation and Its Affiliates Retirement Savings Plan.

31.     As an individual account, defined contribution retirement plan, the BI Plan provide for individual accounts "for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and loss, and forfeiture of accounts of other participations which may be allocated to such participant's account." 29 U.S.C § 1002(34).

32.     In accordance with 29 U.S.C. § 1103(a), the assets of the BI Plan are held in a trust fund.

33.    The Plan is funded by a combination of wage withholdings by Plan participants and Matching Company Contributions, each of which is deposited into the Plan's trust funds.[1]

34.    Participants in the BI Plan are fully and immediately vested with regard to their own contributions and earnings thereon to their individual accounts in the BI Plan. Plan Document, Section 7.2(a).

35.    Under Section 5.3 of the Plan Document, "[a]mounts forfeited in accordance with Section 7.2(f) shall be used to repay previously forfeited amounts required to be restored to a Participant's Company Account in accordance with such Section, to reduce Employer contributions, *or* to pay reasonable administrative expenses incurred in the administering the Plan and Trust, *as determined by the Company its discretion*." (emphasis added).[2]

36.    Upon their deposit into the Plans' trust funds, all participant contributions and company contributions become assets of the Plan.

37.    Setting aside restoration of benefits to rehired employees, when the time comes to actually exercise the discretion provided by Section 5.3 of the Plan Document, to determine whether forfeitures will be allocated toward Plan administrative expenses or toward reducing BI's Plan contributions, the Plan Committee makes those discretionary, forfeiture allocation determinations in a fiduciary capacity.

---

[1] Under Section 1.31 of the Plan Document, "Company-Matching Contributions" are "Employer contributions made in accordance with Section 5.1 which match a Participant's Basic Contributions."  In turn, "Basic Contributions," under Section 1.5 of the Plan Document, means "[a] Participant's contributions made under the applicable provisions of Section 4.1."

[2] In turn, the pertinent part of Section 7.2(f) of the Plan Document provides that "the portion of a Participant's Company Account which is not vested under the foregoing schedule at the time of his or her Termination of Employment shall be forfeited and applied in accordance with Section 5.4 at the time the Participant receives a distribution." The Plan Document does not define the term "administrative expenses" anywhere.

38.      The Boehringer  Ingelheim USA Corporation and Its Affiliates Retirement Savings Plan Summary Plan Description ("SPD") (summary as of January 1, 2025), similarly provides that, consistent with the Plan Document, that "[t]he Company may, *in its discretion*, use forfeitures to defray Savings Plan expenses or to reduce Employer contributions." *Id.* at 16 (emphasis added).

39.      The June 9, 2025 Plan Participant Fee Disclosure further explains that "Plan administrative fees may include recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan. Some plans may deduct these fees and expenses from individual accounts in the Plan. Based on the information and direction Fidelity had on file at the time this Notice was prepared, no Plan administrative fees will be deducted directly as a transaction viewable in account history from accounts in the Plan. However, *the Plan's administrative services may be paid for through offsets and/or payments associated with one or more of the Plan's investment options*. Please keep in mind that fees are subject to change." (emphasis added).

40.      Thus, unless the Plan Committee allocates Plan forfeitures to "pay reasonable administrative expenses," the Plans' administrative expenses are charged to the Plan participants' accounts "through offsets and/or payments associated with one or more of the Plan's investment options."

41.      Consistent with the Plan Participant Fee Disclosure, all of Plaintiffs' Plan quarterly account statements from the Class Period state that "[s]ome of the administrative expenses performed for the Plan were underwritten from the total operating expenses from the Plan's investment options."

9

42.    This fee arrangement is known as "indirect compensation" or "revenue sharing" and permits BI to make Plan administrative fees less transparent to participants so they do not understand how much they are being charged for administrative services.

43.    Finally, the Plan's 5500 Forms, from 2019 to 2023, show that Plan participants, like Plaintiffs, paid between $4.11 million to $5.61 million in total Plan administrative expenses.

44.    In other words, Plaintiffs paid administrative expenses out of their Plan accounts because the Plan Committee discretionarily decided to reduce future company contributions instead of reducing or eliminating Plan administrative expenses for participants as they were discretionarily permitted to do under Section 5.3 of the Plan Document.

45.    The deduction of the Plans' administrative expenses from the participants' accounts reduced the funds available to participants for distribution and/or investing, and deprived the Plan of funds that otherwise would have been earned on the amounts deducted.

46.    Yet, the Plan Committee has used its discretion regarding Plan forfeitures to primarily favor the company between September 11, 2019 to the present, by using those Plan forfeitures to primarily reduce the expense paying Company Matching Contributions rather paying Plan administrative expenses for the benefit of Plan participants.

47.    The Audited Financials to the BI forms have identical language from 2019 to 2023, stating how much of the Plan forfeitures were used and for what purpose.

48.    These Audited Financial Statement footnotes (which are attached to Plan 5500 Forms filed with US Department of Labor) for the BI Plan, which are signed on pains of perjury by an independent third-party auditor, provide the amount spent on reducing employer contributions, the amount spent on administrative expenses, and the current and year-end balances of Plan forfeitures.

49.     The Audited Financials to the BI Plan 5500 Forms from 2019 states: "If a participant terminates employment with the Company at a time when the participant does not have a fully vested interest, the non-vested Company matching contribution and actual earnings thereon are forfeited. *Forfeitures are left in the Plan to fund future Company contributions or to pay reasonable administrative expenses incurred in administering the Plan and Master Trust*. Funds forfeited during 2019 and 2018 amounted to approximately $3,476,630 and $3,249,848, respectively. Total forfeitures balance as of December 31, 2019 and 2018 were $787,137 and $948,357, respectively. *In 2019 and 2018, forfeitures of $3,600,000 and $3,002,275 were used to reduce employer's contributions and forfeitures of $114,177 and $213,935 were used to pay plan expenses, respectively*." (emphasis added).

50.     The Audited Financials to the BI Plan 5500 Forms from 2020 state: "If a participant terminates employment with the Company at a time when the participant does not have a fully vested interest, the non-vested Company matching contribution and actual earnings thereon are forfeited. *Forfeitures are left in the Plan to fund future Company contributions or to pay reasonable administrative expenses incurred in administering the Plan and Master Trust*. Funds forfeited during 2020 and 2019 amounted to approximately $3,129,984 and $3,476,630, respectively. Total forfeitures balance as of December 31, 2020 and 2019 were $644,581 and $787,137, respectively. *In 2020 and 2019, forfeitures of $2,900,000 and $3,600,000 were used to reduce employer's contributions and forfeitures of $372,540 and $114,177 were used to pay plan expenses, respectively*." (emphasis added).

51.     The Audited Financials to the BI Plan 5500 Forms from 2021 state: "If a participant terminates employment with the Company at a time when the participant does not have a fully vested interest, the non-vested Company matching contribution and actual earnings thereon are

11

forfeited. *Forfeitures are left in the Plan to fund future Company contributions or to pay reasonable administrative expenses incurred in administering the Plan and Master Trust*. Funds forfeited during 2021 and 2020 amounted to approximately $3,219,073 and $3,129,984, respectively. Total forfeitures balance as of December 31, 2021 and 2020 were $602,220 and $644,581, respectively. *In 2021 and 2020, forfeitures of $3,244,334 and $2,900,000 were used to reduce employer's contributions and forfeitures of $17,100 and $372,540 were used to pay plan expenses, respectively*." (emphasis added)

52.    The Audited Financials to the BI Plan 5500 Forms from 2022 state: "If a participant terminates employment with the Company at a time when the participant does not have a fully vested interest, the non-vested Company matching contribution and actual earnings thereon are forfeited. *Forfeitures are left in the Plan to fund future Company contributions or to pay reasonable administrative expenses incurred in administering the Plan and Master Trust*. Funds forfeited during 2022 and 2021 amounted to approximately $4,078,184 and $3,219,073, respectively. Total forfeitures balance as of December 31, 2022 and 2021 were $730,404 and $602,220, respectively. *In 2022 and 2021, forfeitures of $3,950,000 and $3,244,334 were used to reduce employer's contributions and forfeitures of $0 and $17,100 were used to pay plan expenses, respectively*." (emphasis added).

53.    The Audited Financials to the BI Plan 5500 Forms from 2023 state: "If a participant terminates employment with the Company at a time when the participant does not have a fully vested interest, the non-vested Company matching contribution and actual earnings thereon are forfeited. *Forfeitures are left in the Plan to fund future Company contributions or to pay reasonable administrative expenses incurred in administering the Plan and Master Trust*. Funds forfeited during 2023 and 2022 amounted to approximately $2,619,860 and $4,078,184, respectively. Total

forfeitures balance as of December 31, 2023 and 2022 were $3,718,056 and $730,404, respectively. *In 2023 and 2022, forfeitures of $2,740,000 and $3,950,000 were used to reduce employer's contributions, respectively.*" (emphasis added).

54.     From 2019 to 2023, even though the Plan permitted Plan forfeitures to be used to pay Plan expenses, and the Plan Committee had the discretionary ability to do so, Plan forfeitures were used mostly to reduce future contributions for the company and only to pay comparatively small amounts of Plan administrative expenses, if any at all.

55.     From 2019 to 2023, the Plan Committee made a discretionary fiduciary decision to allocate $16.4 million dollars in Plan forfeitures to reduce Company Matching Contributions, and only allocated $503,817 in Plan forfeitures to pay Plan administrative expenses for participants, which is a ration of over 32:1. Such discretionary actions by the Plan Committee benefitted BI and not Plan participants.

56.     The language in the Audited Financials from 2019-2023, consistent with the Plan and the SPD, establish that the Plan Committee had fiduciary discretion to use the Plans' forfeited funds for employer contributions "*or*" to pay the Plans' administrative expenses, but used Plan forfeitures in a discretionary matter almost exclusively to reduce employer Plan contributions.

57.     The following chart shows BI's Plan use of forfeiture allocations from 2019 through 2023, in terms of Plan forfeitures that were not used to pay Plan administrative expenses, but that could have been paid through use of Plan forfeitures:

**Forfeitures Not Used to Pay Plan Expenses**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| **Minimum Forfeitures Available to offset Plan Expenses** | $3,600,000 | $2,900,000 | $3,244,334 | $3,950,000 | $2,740,000 | |
| **Total Direct Compensation** | $4,112,503 | $4,261,450 | $4,230,112 | $5,608,972 | $4,505,460 | |
| **Forfeitures used to pay Plan Expenses** | $114,177 | $372,540 | $17,100 | $0 | $0 | |
| **Potential Losses** | $3,600,000 | $2,900,000 | $3,244,334 | $3,950,000 | $2,740,000 | |
| *Compounding Percentage (Plan Return)* | | 13.61% | 15.07% | -16.39% | 17.65% | 19.25% |
| **Potential Cumulative Compounded Losses** | $3,600,000 | $6,989,943 | $11,287,958 | $13,387,592 | $18,490,039 | $22,049,116 |

58.    The "Total Direct Compensation" row in the chart above is based on Plan 5500 Forms, Schedule C Direct Compensation Expenses from the BI Master Trust, of which the BI Plan is the largest component plan.

59.    Estimates of the direct compensation expenses paid by the BI Plan have been allocated based on the percentage of total assets of the Master Trust that the BI Plan constitutes. The BI Plan made up between 55% to 63% of the BI Master Trust total assets from 2019 to 2023.

60.    Using the forfeitures to reduce future employer contributions is usually, but not always, in the best interest of BI because that option decreases BI's own contribution costs and means that BI does not need to take money out of its own general revenues to pay for its Company Matched Contributions.

61.    The option to reduce future employer contributions is not always in BI's best interest and may be in the best interests of Plan participants where there is a risk that BI may be financially unable to satisfy its Plan contribution obligations.

62.    However, absent a risk that BI would be unable to satisfy its contribution obligations under the BI Plan, using forfeitures to "pay administrative expenses" for Plan participants would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such administrative expenses.

63.     Despite the conflict of interest presented by this decision, the Plan Committee failed to undertake an investigation into which option was in the best interest of the Plan's participants and beneficiaries.

64.     Defendants did not, for example, investigate whether there was a risk that BI would default on its contribution obligations if forfeitures were used to pay the Plan's administrative expenses, or evaluate whether there were sufficient forfeitures to eliminate the Plan's administrative expenses charged to participants and still offset a portion of BI's own contribution obligations, as a prudent person would have done.

65.     Defendants also failed to consult with an independent non-conflicted decisionmaker to advise them in deciding upon the best course of action for allocating the forfeitures in the Plan, as a prudent person would have done.

66.     Although ERISA requires Defendants to defray the Plan's expenses, see 29 U.S.C. § 1104(a)(1)(A)(ii), and although the BI Plan permitted Defendants to use the forfeited funds to pay reasonable administrative expenses rather than pay company contributions, throughout the Class Period the Plan Committee consistently and reflexively utilized almost exclusively all of the forfeited funds on a yearly basis to reduce the amount of money BI had to take out of its general revenues and corporate treasuries to support the maintenance of the BI Plan.

67.     For each year between 2019 and 2023, BI was under no risk of defaulting on its contribution obligations to the Plan. Nevertheless, throughout that period, the Plan Committee consistently based the decision of how to allocate forfeitures solely on their own self-interest and failed to consider the interests of the Plan and its participants.

68.     While Defendants' decisions to use the Plan's forfeitures to reduce its outstanding and unpaid contributions benefitted the Company by lowering its costs, it harmed the BI Plan,

along with its participants and beneficiaries, by reducing the amount of assets the Plan otherwise would have received and by causing deductions from participants' accounts to cover administrative expenses that otherwise could have been covered in whole or in part by the Plan's forfeitures, without providing any "additional benefits" to Plan participants.

69.    The Plan Committee's misallocation of the Plan's forfeitures can be divided into two separate types of fiduciary violations: (1) inappropriately utilizing forfeitures to offset employer contributions instead of paying Plan administrative expenses; and (2) not exhausting Plan-forfeiture balances by year-end consistent with IRS guidance.

## BI'S DISLOYAL, IMPRUDENT, AND CONFLICTED USE OF PLAN FORFEITURES

70.    ERISA explicitly requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

71.    Furthermore, in deciding to use the Plan's forfeitures to benefit itself as far as reducing Company Matching Contributions through use of the Plan's assets, Defendants acted with a conflict of interest in administering the Plan and in managing and disposing of its assets. Such self-dealing violates both the ERISA party-in-interest and fiduciary prohibited transaction rules under 29 U.S.C. § 1106(a)(1)(D) and 29 U.S.C. § 1106(b).

72.    IRS guidance regarding the reduction of employer contributions through use of plan forfeitures: (1) do not speak to prohibited transactions, (2) have been superseded by more recent guidance, (3) only exist in the form of proposed regulations, and/or (4) do not apply to private actions based on Department of Labor fiduciary duties but only to IRS audits.

73.     ERISA also provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

74.     Despite the conflict of interest presented by the decision to use BI Plan's forfeitures for BI's own benefit, Defendants failed to undertake any prudent investigation into which option the most prudent action to take.

75.     At the very least, Defendants should have used the fiduciary discretion granted to it to pay Plan administrative expenses to serve the best interest of Plan participants. Defendants' contrary fiduciary decision-making with regard to the BI Plan cost the Plan's participants over $22 million dollars from 2019 through 2023:

| Forfeitures Used for Employer's Benefit | | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| **Forfeitures Used to Reduce Employer Contributions** | $3,600,000 | $2,900,000 | $3,244,334 | $3,950,000 | $2,740,000 | |
| *Compounding Percentage (Plan Return)* | | 13.61% | 15.07% | -16.39% | 17.65% | 19.25% |
| **Potential Cumulative Compounded Losses** | $3,600,000 | $6,989,943 | $11,287,958 | $13,387,592 | $18,490,039 | $22,049,116 |
| **Sources:** | 2019 Form 5500, Page 21 of 34 | 2020 Form 5500, Page 21 of 36 | 2021 Form 5500, Page 23 of 39 | 2022 Form 5500, Page 22 of 37 | 2023 Form 5500, Page 23 of 38 | |

76.     While Defendants' reallocation of the forfeitures in the Plan's trust funds to reduce its future contributions benefitted BI by reducing its own contribution expenses and allowing it not to take additional monies out of its general revenues or corporate treasury, it harmed the BI Plan, along with its participants and beneficiaries, by reducing future Company contributions that would otherwise have increased Plans' assets and by causing participants to incur deductions of administrative expenses from their individual accounts.

77.    Defendants received a benefit while participants simply received that which they would have received anyway, while remaining on the hook for paying their share of the Plans' administrative expenses. There were no "additional benefits" participants sought.

78.    Defendants should have had a fiduciary process in place to determine the best manner to use Plans' forfeitures under their fiduciary duty of prudence. Defendants had no such procedures, or ineffective procedures, in place given the imprudent manner in which the Plan's forfeitures were utilized mostly for BI's own benefit.

79.    Furthermore, in deciding to use the Plan's forfeitures to benefit itself as far as reducing future company contributions through use of the Plan's forfeitures, Defendants acted with a conflict of interest in administering the Plan and in managing and disposing of its assets.

80.    Such benefiting of the party-interest employer and self-dealing violates both the ERISA party-in-interest and fiduciary prohibited transaction rules under 29 U.S.C. § 1106(a)(1)(D) and 29 U.S.C. § 1106(b).

81.    By allocating forfeitures toward offsetting employer contributions, and saving BI millions of dollars in Plan contributions, the Plan Committee, a fiduciary, benefitted BI, a "party in interest," and also dealt with the assets of the Plans in their own interest and for their own account in violation of both party-in-interest and prohibited transaction rules.

82.    Defendants' conduct amounts to a "transaction" between the Plan Committee and BI, insofar as BI benefitted from the Plan Committee's decisions to use the Plan's forfeitures almost exclusively to reduce BI's contributions to the Plan and thus, allowed it to save money by not having to take additional funds out of its corporate treasury to fund its contributions to the BI Plan.

83.     The movement of the Plan's forfeitures is not just a neutral "intra-pan transfer" within the BI Plan that provides no benefit to BI, but a movement of funds outside of the Plan that leads to BI not having to engage in a "transaction" by which its corporate general revenues are needed to fund its contributions to the BI Plan.

84.     Allocating forfeitures to reduce employer contributions provides a direct financial benefit to a party-in-interest, and therefore is not neutral. It also amounts to fiduciary self-dealing because such transactions are undertaken by the employer-fiduciary, BI, and constitute a prohibited transaction under both §§ 406(a)(1)(D) and 406(b)(1).

## UNTIMELY EXHAUSTION OF FORFEITURE SUSPENSION ACCOUNTS

85.     IRS guidance make clear that the BI Plan should have allocated all of the Plan's forfeitures  no later than the end of the Plan Year in which the forfeiture occurred.

86.     In its Retirement News for Employers Newsletter from Spring 2010, the IRS published an article entitled "*Fixing Common Plan Mistakes: Improper Forfeiture Suspense Accounts*," discussing IRS Publication 4278-B (2010), p4278.pdf (irs.gov).

87.     In pertinent part, that article states that "[f]orfeitures must be used or allocated in the plan year incurred. *The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise*." (emphasis added).

88.      "Revenue Ruling 80-155 states that a defined contribution plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula defined in the plan. This would preclude a plan from carrying over plan forfeitures to subsequent plan years, as doing so would defy the rule requiring all monies in a defined contribution plan to be allocated annually to plan participants."

89.    The same article states that "[t]he plan document's terms should have provisions detailing how and when a plan will exhaust plan forfeitures. A plan's failure to use forfeitures in a timely manner denies plan participants additional benefits or reduced plan expenses."

90.    The IRS concludes that "this failure can be corrected by reallocating all forfeitures in the plan's forfeiture suspense account to all plan participants who should have received them had the forfeitures been allocated on time."

91.    Consequently, the IRS guidance make clear that BI was required to monitor plan forfeitures and exhaust such forfeitures on a yearly basis.

92.    Accordingly, on December 31st of each year, the contributions that have accrued throughout the prior calendar year become outstanding and unpaid amounts owing to the Plan.

93.    If a suspense account is used, as it was with the BI Plan, then BI should have ensured that all forfeitures for the Plan years were promptly exhausted by year end.

94.    Defendants violated their fiduciary duty of prudence by not using their forfeiture suspense account as instructed by the IRS, thereby causing Plaintiffs and other Plan members to be denied additional forfeitures allocated in their interest.

95.    As shown in the chart below, Plaintiffs nearly $1.0 million in losses from 2019-2023, caused by the Plan Committee's imprudence in failing to exhaust Plan forfeiture suspense accounts in a timely manner at the end of each year:

| Forfeiture End of Year Balances | | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Forfeiture Balance EOY | $787,137 | $644,581 | $602,220 | $730,404 | $3,718,056 | |
| Forfeiture Annual Losses | $0 | $107,126 | $97,166 | -$98,718 | $128,891 | $715,674 |
| Compounding Percentage (Plan Return) | | 13.61% | 15.07% | -16.39% | 17.65% | 19.25% |
| Potential Cumulative Compounded Losses | $0 | $107,126 | $220,440 | $85,586 | $229,580 | $989,446 |
| Sources: | 2019 Form 5500, Page 21 of 34 | 2020 Form 5500, Page 21 of 36 | 2021 Form 5500, Page 23 of 39 | 2022 Form 5500, Page 22 of 37 | 2023 Form 5500, Page 23 of 38 | |

## CLASS ACTION ALLEGATIONS

96.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

97.     In acting in his representative capacity for the BI Plan, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the BI Plan.

98.     Plaintiff seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of The Boehringer Ingelheim USA Corporation and Its Affiliates Retirement Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning September 11, 2019, and running through the date of judgment.

99.     The Class includes approximately 12,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

100.     There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the BI Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

   a.     Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

   b.     Whether Defendants breached their fiduciary duties to the Plan and engaged in prohibited transactions;

   c.     What are the losses to the Plan resulting from each breach of fiduciary duty and prohibited transaction; and

   d.     What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty and prohibited transactions.

101.    Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were a participant of the BI Plan during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

102.    Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plans during the Class period, have no interests that conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

103.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

104.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

105.    Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

106.    The claims brought by the Plaintiffs arise from fiduciary breaches and prohibited transactions as to the Plan in its entirety and do not involve mismanagement of individual accounts.

107.    The claims asserted on behalf of the Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan.

108.    Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of the Plan for breaches of fiduciary duty or for prohibited transactions.

109.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the plan.

110.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan's Administrator) are the same individuals that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a plan administrator's decisions – does not exist here because courts will not defer to plan administrator's legal analysis and inter-pretation.

## FIRST CLAIM FOR RELIEF
### Breach of Duty of Loyalty
### Plaintiffs, on behalf of themselves and Class, Against Plan Committee
### (Misallocation of Plans' Forfeitures)

111.    Plaintiffs restate the above allegations as if fully set forth herein.

112.    Defendant Plan Committee is a fiduciary of the BI Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

113.    Pursuant to 29 U.S.C. § 1104(a)(1)(A), Defendant Plan Committee was required to discharge their duties to the BI Plan "solely in the interest of the participants and beneficiaries"

and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

114.    Defendant Plan Committee has continually breached this duty of loyalty with respect to their control and management of the BI Plan's assets throughout the Class Period by choosing to utilize forfeited funds in the Plan mostly for the benefit of BI rather than solely in the interest of the Plan's participants and beneficiaries as required under ERISA.

115.    Instead of acting solely in the interest of the Plan's participants by utilizing forfeited funds in the Plan to reduce or eliminate Plan administrative expenses as the BI Plan permits, Defendant Plan Committee chose to use the Plan's assets mostly for the purpose of reducing BI's contributions to the Plan, thereby saving BI tens of millions of dollars at the expense of the Plan and their participants, who were forced to incur avoidable Plan administrative expense deductions to their individual accounts.

116.    In making these Plan forfeiture decisions, Defendant Plan Committee was motivated primarily or exclusively by their own self-interest rather than the interests of the Plan's participants and beneficiaries, in violation of ERISA's fiduciary duty of loyalty.

117.    As a direct and proximate result of Defendant Plan Committee's fiduciary breaches described herein, the Plan suffered injury and loss for which each member of the Defendant Plan Committee is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan and are subject to appropriate equitable relief pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to BI resulting from the breach of their duty of loyalty.

## SECOND CLAIM FOR RELIEF
### Breach of Duty of Prudence
### Plaintiffs, on behalf of themselves and Class, Against Plan Committee
### (Misallocation of Plan Forfeitures)

118.    Plaintiffs restate the above allegations as if fully set forth herein.

119.    Pursuant to 29 U.S.C. § 1104(a)(1)(B), Defendant Plan Committee was required to discharge their duties with respect to the BI Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

120.    Defendant Plan Committee has continuously breached their duty of prudence under 29 U.S.C. § 1104(a)(1)(B) throughout the Class Period by declining to use more of the forfeited funds in the Plan to eliminate or reduce the Plan administrative expenses charged to participant accounts, and instead discretionarily utilized the Plan's forfeitures to reduce BI's Matching Contributions to the Plan.

121.    In deciding how to allocate forfeitures, Defendant Plan Committee utilized an imprudent and flawed process.  Despite the conflict of interest presented by their forfeitures allocation decisions, Defendant Plan Committee failed to undertake any reasoned and impartial decision-making process to determine whether using the forfeited funds in the Plan to mostly reduce the Company's own contributions, as opposed to reducing the Plan administrative expenses charged to participant accounts, was prudent.

122.    The Plan Committee also failed to consider whether participants would be better served by another use of these forfeiture Plan assets after considering all relevant factors.

123.    By refusing to use more of the forfeited funds in the Plan to eliminate or reduce the Plan administrative expenses charged to participant accounts, and instead using the Plan's forfeitures to reduce BI's own Matching Contributions to the Plan, Defendant Plan Committee caused the Plan to receive fewer contributions that would otherwise have increased Plan's assets.

124.    The Plan Committee's actions caused Plan participants to incur expense and fee deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the forfeited funds to pay Plan administrative expenses, as discretionarily permitted under the Plan Document.

125.    Defendant Plan Committee also breached their duty of prudence by failing to follow IRS guidance, which makes clear that the BI Plan should have allocated all of the Plan's forfeitures by the end of each Plan year.

126.    On December 31st of each year, the Plan forfeitures that accrued throughout the prior calendar year become outstanding and unpaid amounts owing to the Plan.

127.    The IRS guidance makes clear that BI was required to monitor plan forfeitures and exhaust such forfeitures on a yearly basis. If a suspense account is used, as it was with the BI Plan, then BI should have ensured that all forfeitures for the Plan years were promptly exhausted by year end.

128.    Defendant Plan Committee violated their fiduciary duty of prudence by not using their forfeiture suspense account as instructed by the IRS, thereby causing Plaintiffs and other of the Plan's members to be denied reduced Plan administrative expenses through additional allocation of forfeitures.

129.    As a direct and proximate result of Defendant Plan Committee's fiduciary breaches described herein, the Plan suffered injury and loss for which each member of the Defendant Plan

Committee is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan and are subject to appropriate equitable relief pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to BI resulting from the breach of their duty of prudence.

**THIRD CLAIM FOR RELIEF**
**Fiduciary Prohibited Transactions**
**Plaintiffs, on behalf of themselves and Class, Against Plan Committee**
**(Self-Dealing with Forfeitures)**

130.    Plaintiffs restate the above allegations as if fully set forth herein.

131.    29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not," among other things, "deal with the assets of the plan in his own interest or for his own account."

132.    Defendant Plan Committee violated this prohibition in its management and control of forfeitures in the Plan.  By allocating these Plan's assets mostly toward reducing BI's Matching Contributions owing to the Plan, thereby saving BI tens of millions of dollars in contribution expenses from their own corporate treasury, Defendant Plan Committee dealt with the assets of the Plan in BI's own interest and for their own account.

133.    Defendant Plan Committee's reallocation of plan assets to reduce BI's own contribution is a 'use' of plan asserts for the purposes of § 1106(a)(1).

134.    As a result of this prohibited conduct, Defendant Plan Committee caused the Plan to suffer losses in the amount of the Plan's assets that were substituted for employer contributions and the lost investment returns on those assets.

135.    Each member of the Defendant Plan Committee is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan's assets and is subject to other equitable or remedial relief as appropriate.

**FOUTH CLAIM FOR RELIEF**
**Party-In-Interest Prohibited Transactions**
**Plaintiffs, on behalf of themselves and Class, Against Plan Committee**
**(Benefitting Employer)**

136.    Plaintiffs restate the above allegations as if fully set forth herein.

137.    29 U.S.C. § 1106(a)(1)(D) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect - transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

138.    Defendant Plan Committee, as fiduciaries of the BI Plan, caused the Plan to engage in a "transaction" that "use" the assets of Plan for the benefit of a party in interest, BI, by using Plan's forfeitures almost exclusively to reduce the future Company Matching Contributions of BI during the Class Period.

139.    Defendant Plan Committee's reallocation of plan assets to reduce its own Plan contribution is "dealing with" plan assets for the purposes of § 1106(b)(1).

140.    By allocating Plan forfeitures to be used for the benefit of reducing future employer contributions, Defendant Plan Committee misused tens of millions of dollars of Plan forfeitures which could have been reallocated instead to pay Plan expenses.

141.    Each member of the Defendant Plan Committee is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan's assets and is subject to other equitable or remedial relief as appropriate.

**FIFTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**Plaintiffs, on behalf of themselves and Class, Against Defendants Company and Board**
**(Misallocation of Forfeitures and Self-Dealing)**

142.    Plaintiffs restate the above allegations as if fully set forth herein.

28

143. Under the BI Plan Document, Defendants BI and Board had the authority to appoint and remove members or individuals on the Plan Committee responsible for Plan's forfeitures and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

144. In light of this authority, Defendants BI and Board had a duty to monitor those individuals responsible for Plan's forfeitures on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the BI Plan in the event that these individuals were not fulfilling those duties.

145. Defendants BI and Board had a duty to ensure that the individuals responsible for Plan's forfeitures on the Plan Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the BI Plan's forfeitures; and reported regularly to Defendants BI and Board.

146. The objectively disloyal, imprudent, and conflicted manner in which Defendant Plan Committee handled the Plan's forfeitures inferentially establish that Defendants BI and Board breached their duty to monitor by, among other things:

    a. Failing to monitor and evaluate the performance of individuals responsible for the Plan's forfeitures on the Plan Committee or have a system in place for doing so, standing idly by as the BI Plan misallocated the Plan's forfeiture for BI's benefit;

    b. Failing to monitor the process by which individuals responsible for the Plan's forfeitures were evaluated and failing to investigate the proper use of the Plan's forfeitures; and

    c. Failing to remove individuals responsible for Plan forfeitures on the Plan Committee whose performance was inadequate in that these individuals continued to misallocate Plan forfeitures for the benefit of BI.

147. As a consequence of the breaches of the duty to monitor the allocation of the Plan's forfeitures, the Plaintiffs and the Plan's participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

148. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants BI and Board are liable to restore to the BI Plan all losses caused by their failure to adequately monitor individuals responsible for Plan's forfeitures on the Plan Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration the Defendants have breached their fiduciary duties and engaged in prohibited transactions under ERISA;

D. An Order compelling the Defendants to make good to the BI Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty and prohibited transactions, including restoring to the Plan all losses resulting from misallocation of Plan forfeitures, and restoring to the Plan all profits the Defendants made through use of the BI Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations and not engaged in prohibited transactions;

E. An Order requiring BI to disgorge all profits received from, or in respect of, the BI Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against BI as necessary to effectuate relief, and to prevent BI's unjust enrichment;

F. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties or from engaging in prohibited transactions;

G.   Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary to administer the BI Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties or engaged in prohibited transactions;

H.   An award of pre-judgment interest;

I.   An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.   Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: September 11, 2025

**COWDERY, MURPHY &  HEALY, LLC**

*/s/ James J. Healy*
James J. Healy
280 Trumbull Street
Hartford, CT 06103
Telephone: (860) 278-5555
jhealy@cmandh.com

**WALCHESKE & LUZI, LLC**

Paul M. Secunda (*pro hac vice* pending)
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

*Attorneys for Plaintiffs and Proposed Class*